GRIBBLE *v.* STATE.

Crim. 3901

Opinion delivered October 15, 1934.

*M. E. Vinson* and *Reece Caudle,* for appellant.

*Hal L. Norwood,* Attorney General, and *John H. Caldwell,* Assistant, for appellee.

BAKER, J. On the 27th day of February, 1934, the grand jury of Cleburne County returned into open court an indictment charging Leonard Gribble, the appellant, with murder in the first degree. It was alleged that on the first day of December, 1932, the appellant shot and killed Aubrey Kever. The indictment was in the usual form and not questioned, as to its sufficiency, in any particular. The cause came on for trial, and on March 1, 1934, the jury returned into court the following verdict: "We, the jury, find the defendant guilty and fix his punishment at 5 years in the Arkansas Penitentiary." The verdict was

signed by the foreman and the court rendered judgment upon it on the 3d day of March, 1934. The motion for a new trial was filed in due time, overruled and appeal has been duly granted.

The facts necessary for the discussion of the case and errors alleged and set up in motion for new trial are about as follows: On December 1, 1932, Oren Kever and Aubrey Kever, together with their uncle, Willie Southerland, went to Leonard Gribble's place of business in Heber Springs, and immediately upon their arrival a controversy arose, and Gribble ordered them to take their truck, which they had driven to his garage, or filling station, and move it away.

Prior to that time Aubrey Kever and Leonard Gribble had had some disturbances, and at one time, fixed by different witnesses at a period from two to four years prior thereto, had gotten into a fight, and Gribble had struck Kever with a wrench. Gribble testified that almost constantly since that time he had been pursued and taunted by Kever, who was always seeking a renewal of the former difficulty; that on the occasion of the fight, when he had struck him with the wrench, Kever was drinking, and that he had led him away from his garage two or three times, but that Kever followed him back, and assaulted him by kicking him, and that he, Gribble, was trying to close the door of his office, or shop, to prevent Kever from entering, and was finally compelled to strike Kever with a wrench, in order to protect himself, and he had finally called officers to take Kever away. About the first of the next month he had met the two Kever brothers on the sidewalk, and that Aubrey, particularly, had tried to fight, but he (Gribble) finally got away from him; that later, Kever had come to his place of business and a Mr. Rackley took him away on that occasion, and that Kever left threatening him with the words "I'll get you in time"; that a short time before the killing Aubrey Kever had tried to block the highway with a truck to keep Gribble from getting by. That there were not two months in the two years from the time of the first disturbance but that Aubrey Kever came in contact with him. He had heard of the trouble Kever

had had with Obrie Logan, with the Birds, and several others; that on this occasion, the day of the killing, when Aubrey Kever, Butch Kever and Willie Southerland drove up to his place of business, he waited until they had gotten out of the truck and walked around by the truck, and that he then went out, spoke to them, and asked what he could do for them. Aubrey asked for Fitzgerald, and, upon his answer, Aubrey said: "I don't care nothing about talking to you"; that his response was, "If that's the way you feel about it, go ahead and much obliged"; that he started then to pass between Aubrey Kever and a concrete pillar; that Kever blocked his way; that he turned and went around another way and Kever started after him; that Kever then said that he had hit him once with a wrench and wanted to know if he thought he could do that again; that he asked him to leave; that Kever did not stop but started running in; that he ordered Kever to stop; that he did not; that Kever had his hands in his pockets; that the other two, Oren Kever and Southerland, had gotten in the truck and went driving away. In the meantime Gribble had picked up his shotgun, which was inside his office and that, when Kever refused to stop, he shot him.

Considering the evidence as offered, it tended to show that Kever, the man who was killed, was frequently in disturbances with other people in the community; that he was somewhat persistent in trying to follow up and settle his original quarrel with Gribble, and some of the evidence is to the effect that at the time he was killed he had, perhaps, gone to Gribble's garage to see Fitzgerald, at Fitzgerald's suggestion, to collect from Fitzgerald some amount of money owing him by Fitzgerald, but we think that the evidence, with a fair degree of clearness, shows that Gribble did not know that that was the purpose of the visit there, and that he had a right to presume that Kever had returned for the sole purpose of renewing the old difficulties. Attention is called to this fact for the reason that it arises in one of the assignments of error set up in the motion for a new trial, which will be discussed later.

The foregoing is a sufficient, statement of the facts to permit a discussion of the questions presented to us in the motion for a new trial.

The first matter discussed in appellant's brief is the form of the verdict: "We, the jury, find the defendant guilty and fix his punishment at five years in the Arkansas Penitentiary." The question raised under this allegation of error arises out of the construction of § 3205, Crawford & Moses' Digest, which reads as follows: "The jury shall, in all cases of murder, on conviction of the accused, find by their verdict whether he be guilty of murder in the first or second degree; but if the accused confess his guilt, the court shall impanel a jury and examine testimony, and the degree of crime shall be found by such jury."

The form of verdict, above quoted, does not say in express language whether the defendant is guilty of murder in the second degree or voluntary manslaughter. If the effect of it should be determined by reference to the penalty of five years in the penitentiary, then it is insisted, as we understand from appellant's argument, that the jury might have meant a conviction for murder in the second degree, the lowest penalty for which is five years in the penitentiary. But the penalty for voluntary manslaughter is from two to seven years. The court holds that, by the omission from the verdict of a statement showing the degree of the offense, it was the intention of the jury to acquit the appellant of murder in the first and second degrees; that the mandate of the statute, above quoted, is such that, had it been the intention of the jury to convict the appellant of murder, it would have said by the verdict: "We, the jury, find the defendant guilty of murder in the second degree, and fix his punishment at five years in the Arkansas Penitentiary," and that by the omission of the words "of murder in the second degree," it is clear that the effect of the verdict was, first, an acquittal of murder, and, second, a conviction for the next highest offense, voluntary manslaughter.

The writer of this opinion is not in full accord with the reasoning of a majority of the court.

It must be agreed, however, by all, that upon a conviction for murder, the statute requires that the verdict of the jury shall state in express terms the degree of the offense,—that is, whether it be murder in the first degree or murder in the second degree. If acquitted of murder, then the next offense, which is included in the indictment, is voluntary manslaughter, and there is no mandate, by statute or otherwise, requiring that the jury shall state the degree of the offense upon which he is convicted, except in murder, and the general verdict, as returned by the jury in this case, is sufficient. Appellant's case has been briefed on this point, upon the theory that the only interpretation to be placed upon the verdict must arise out of the verdict itself, and that, inasmuch as the five year sentence is affixed to it, and that is the lowest penalty for murder in the second degree, it must have been the intention of the jury to convict the defendant of murder in the second degree. Of course, if that were true, the verdict as returned could not be a basis for a valid judgment. This contention is not without authority to support it. 2 Bishop's New Criminal Procedure (2d ed.), p. 870; *Curtis* v. *State,* 26 Ark. 439; *Fagg* v. *State,* 50 Ark. 506, 8 S. W. 829; *Wallace* v. *State,* 180 Ark. 627, 22 S. W. (2d) 395.

It therefore follows that the only conclusion that can be reached as to this general verdict, without impeaching it, and that is not our duty or obligation, must be to interpret it that the jury found the defendant guilty of voluntary manslaughter and the penalty fixed by the jury is not inconsistent with this holding.

It is upon this point only that the writer has not been in complete agreement with the other members of the court.

This construction and interpretation of the verdict, by the court relieves it of the provisions of the statute, and the alleged error is not prejudicial.

Other questions argued for the reversal of the case is the alleged error of the court in excusing juror John Ghent, juror George Carr, and juror F. W. Davis. These are three jurors, who were excused by the court, as stated in the motion for a new trial, for what is alleged to be

insufficient cause therefor. The examination of these jurors, upon *voir dire,* is not brought forward in the bill of exceptions. We do not know, and cannot ascertain from the transcript filed in this case, the nature or extent of the examination of these jurors, nor can we determine whether or not there was any abuse of the court's discretion, and it must be presumed by us that the discretion of the court was properly exercised.

It is also alleged, in assignment No. 8, that the juror, Chastain, upon his examination, stated that he was not related to any party in interest, either by blood or marriage, and that the defendant, appellant herein, has since been informed and believes that said juror's statement was not correct, but that he is related to the Kever family, and that this fact was unknown to the defendant at the time of the trial.

The same holding as to the examination of this juror, is proper as was stated in the matter of the three above mentioned, whom the court excused. No fact is shown in the bill of exceptions as to the examination of this juror. The bill of exceptions is entirely silent.

It is alleged also, in assignment No. 9, in the motion for a new trial, that one of the jurors, John Bettis, after he had been examined and accepted to try the cause, and had been admonished by the court not to separate himself from the others, did separate himself from the other jurors, as they filed into the jury box and were seated, and went downstairs, below the court room, in conversation with Ray E. Shelby, who had taken more than a passing interest in the trial of the case against the defendant. There is no record made of this incident; at least, it is not brought up in the bill of exceptions. It is not shown that the court's attention to such matter was called, or whether any examination was made of it, if noticed by the court, nor is it shown that the defendant at the time objected. We have only the statement contained in the motion for a new trial.

An opinion as to the qualifications of jurors, and objections made after the trial, as to their fitness or eligibility, or otherwise, was handed down by us on this date, in the case of *Newton* v. *State, ante* p. 789, and

it disposes of the objections to such alleged errors in this appeal.

Error is also alleged in permitting the witness, Floyd Reed, to testify over the objections of the defendant, to the effect that Fitzgerald, in the absence of defendant, had invited Aubrey Kever to Gribble's place to collect some money said to be due him. We see no prejudice in this matter. We presume it was intended to show by this testimony that Kever went to Gribble's place on an errand of peace and not otherwise. It is apparent that Gribble did not know this fact, and that he had a right to presume, and probably did presume, that Kever came there in a fighting mood, and with the intention only of creating a disturbance, or for a fight with the appellant. Gribble was given the advantage of such presumption, under proper instructions. At least, no question is made of any instruction given or refused, and he had the right to have that matter submitted to the jury.

It is also alleged in assignments Nos. 12 and 13 that there was error in permitting the prosecuting attorney to ask the defendant why he did not have a subpoena issued for a certain witness. We are at a loss to see how this question could be prejudicial, and there seems to be nothing from the defendant's answer, which would indicate that it was, and also the prosecuting attorney was permitted to ask the defendant how many times he had been married. There is no showing how any prejudice could arise from the question or from the answer made. There is no implication in the question to affect injuriously his character or standing in the community, or any answer that might have been elicited that would have done so. Marriage is not a prohibited status, nor would the questions tend in any way to excite in the minds of reasonable jurors any feeling of distrust or otherwise impeach in any particular the good standing of the appellant.

It frequently happens, and trial judges soon learn, that it is sometimes more expedient to permit attorneys, in the heat of trials, to wander somewhat far afield. It may save time, expense and delay more than would the most exacting niceties and requirements if they were at-

tempted, on all occasions, to be enforced. At any rate, unless some prejudicial error appears, we must yield to the sound discretion of the trial courts in such matters, where there is no affirmative showing of an abuse of that discretion, which abuse operates to the prejudice of the appellant, we cannot criticize their conduct. It follows therefore that this cause must be affirmed.

It is so ordered.